21-836 and 21-848, United States v. Hawkins. Ms. Glasheter. Good morning, Your Honors. May it please the Court. Mr. Diaz walked out of a building fixing his hair. Mr. Hawkins walked out after him, his arms swinging normally by his sides. Neither did anything suspicious. Despite this, the officers stopped them immediately. This stop was unconstitutional, and so was the frisk and then the subsequent arrest of Mr. Hawkins. Clear video showed that the men did nothing suspicious. The clear video shows them moving normally. The video shows that there are others in the area at the same time. It was the early evening on a Saturday night. Who were the others? Others, you say? Who were the others? Just people walking around near the building. Outside? Outside the building. The building, but not inside the gate. All of the events take place outside of the building. I'm sorry. I thought there was a front door and then some space and then some sort of another door. Yes, there's an outside sort of vestibule area. That's correct. I'm just asking whether this didn't all happen in the vestibule area, yes? The stop happened inside the vestibule area. You say there are lots of people, but are there any other people in the vestibule area? There are other people in the vestibule area. There's a person standing at the door that we can see in the video. There's someone that walks by them. There's somebody sitting just outside the door, and then there's somebody else who walks into the building, right? They're the only ones who are exiting the building at that time. Sure, they're the only ones we see at that specific time exiting the building, but there's nothing. Also, the officers had a shot spot, or what was it called? A shot spot report that said that there was a shot fired from the roof of the building at that time and testified that by the time they arrived, that would be the time that somebody would be exiting if they had come down from the roof. The fact that they're exiting at that time, doesn't that indicate that they would be of interest to the officers? No. Respectfully, first, the officers testified that there is a lag between the sound that's recorded by ShotSpotter, the alert that goes out to the officers, a lag that we don't know how long it is. There's no testimony about that. So there's an unknown amount of lag, and then the officers take a couple minutes to arrive. There's nothing magic about the fact that Mr. Diaz and later Mr. Hawkins walk out of the building at that time. That's pure chance that that's when the officers arrived. The second example, and that's both in the subjective experience of the officers, they testified that somewhere between 50% and 90% of the time, it's inaccurate for a variety of reasons. Either there's no shot, or it's the wrong location. And then we also know objectively from the data that other courts have cited that ShotSpotter is not accurate. Data out of Chicago shows that 86% of the time, no evidence of any crime is found when there is a ShotSpotter alert. So taking all of those things together, the officers know very little about anything occurring when they arrive. And that's especially true because there was a false alarm. I was going to ask you about the false alarm. How do you read that? I think that's further evidence that should have diminished any suspicion the officers had when they arrived. There was already a false alert by ShotSpotter at the neighboring building that very night. How did they know that it was false? Because they got there and they told you? Well, they received, the officers that had arrived hadn't reported to the false alert. They had just received a radio communication saying the alert was unfounded. So the officers- A radio, don't mean to take up all your time. A radio communication. For what? What was the radio communication they received? They received a communication that the earlier ShotSpotter alert was unfounded. That's the word that they were given, unfounded, meaning it was a false alarm. Nothing was found to support that a shot had been fired. And that's true with the second alert as well. There's an alert for ShotSpotter at the neighboring building. There's no corroboration when they stop Mr. Hawkins and Mr. Diaz. So are you saying that they should ignore the ShotSpotter then? I mean, you know, sometimes you have a tip that's phoned in and somebody checks it out and it turns out to be unfounded. That doesn't mean that you don't check it out or that it amounts to reasonable suspicion, does it? No, I'm not saying they should ignore it, but that can't amount to reasonable suspicion. An alert that the officers know is often wrong, that was specifically not correct that very same night for the same location, that can't mean that they stopped two people who are doing nothing suspicious just because they happened to be walking out. This isn't a situation where the officers ask the people in the area, did you hear a shot? They didn't go and just simply investigate. They went and they stopped Mr. Hawkins and Mr. Diaz. That's what's unconstitutional here because they did not have reasonable suspicion to stop them. They didn't have any of that corroboration, no 911 call, no witness who said, I heard a shot, no evidence of a shot, no victim, no property damage, nothing. You just have two young men walking out of the building, not even together, one fixing his hair, one just moving his arms normally. I'm sure the court has seen the video. There was not a reason to stop them. Well, the district court said that the video didn't show the whole encounter. The officers did testify that they were moving suspiciously or turned to the side or creating tension in the sweatshirt, right? So what do you make of that? So there's a lot there. First, the few seconds that's not recorded on video is simply because the officers didn't turn on their body cameras, which they should have. None of the officers testified that something suspicious happened in those couple seconds. One of the officers said that he saw a slight pivot of a body and that one of them was hurrying. The other one said something similar about a pivot and said specifically that it was, quote, not suspicious. The testimony with respect to a tension or a bulge, that happens after the stop. That is why we can speak about that as to why the frisk was unconstitutional. But for the stop itself, there's no testimony about a tension or a bulge. It might be helpful to me if you quickly, if the presider will allow me to tell me what our standard of review is on these questions. Your standard of review is de novo when you have a situation of mixed fact and law, which is exactly what you have here to assess reasonable suspicion and each level of the analysis. So there's nothing to which we, nothing that's before us to which we defer to the district court? Correct. Nothing we have talked about yet. There are other aspects of the stop and the arrest if we get past the reasonable suspicion standard, where I think the court should find that one of the officers was not credible. But to reach what we've been discussing about now, about the fact that there was no reasonable suspicion, it is de novo review. Would you, I'd like to move to the testimony about the bulge. I know my time is running short. Why don't you make one final comment and then we'll hear again from you. After they stopped these individuals, then one of the officers claimed to have seen an unspecified bulge. And at that moment he said it could have been any object. So if the court gets to that point, the court should find that's not for further intrusion, for the frisk, because it is vague, it is uncorroborated by any of the other officers that are there and it's just not enough. What's our standard of review on that? Well, I think there are a number of reasons that you can... What's the standard of review? It depends which reason you base your opinion on. With respect to the credibility of the officer, that's the only thing that gets the abuse of discretion standard. Well, by the time they did the frisk, they had the testimony from the dog walker, right? That's unclear. So the testimony with respect to when they speak to the dog walker is not clear and whether it happened before or after the frisk. The dog walker is also somebody who is outside of the building and shouldn't really be credited for anything other than maybe that he heard something. Okay, they also had interviewed the defendants themselves, right, who had said that they were together in the building but had conflicting stories about what they were doing. I would not call their stories conflicting. They had differences about what floor they were on. So there was a minor inconsistency in what they said, but in broad strokes, they were... They matched. Additionally, by that point, Mr. Hawkins had called the person that he was seeing in the building. That person had come down and spoken to the officers. Mr. Hawkins had also shown his school ID card, and both of them were respectful to the officers as they asked questions. So nothing about that interaction should have raised their suspicion. And then we have this final point specifically for Mr. Hawkins. The officers frisk both individuals. They eventually find a gun on Mr. Diaz. They find nothing on Mr. Hawkins. They arrest him anyway, and their stated reason is because he's with Mr. Diaz and people generally commit crimes together. That is not probable cause. At each step of this interaction, there are things done by the officers that are unconstitutional. So I think the court has a variety of different moments to find that the interaction here was unconstitutional and that the case should be reversed. Okay. Thank you, Ms. Glashauser. We'll hear from you again in rebuttal. Thank you. Let's turn to the government. Mr. Ferguson. Do I recall correctly that you represented the government in the trial court? Yes, Your Honor, and good morning. May it please the court, my name is Micah Ferguson. I'm an assistant United States attorney here in the Southern District of New York. I represent the United States in this appeal, as Judge Sack noted, as I also did in the proceedings below. I'd like to start by clarifying, given that this is a somewhat complicated or lengthy record here, the facts of the case. This investigation started in response to a shot spotter. In fact, there were two shot spotter alerts that night, about an hour apart, nearly identical but for the time. They reported a single shot of live gunfire at rooftop level from what we refer to in the brief as the 940 building. Adjacent to that is a six-story walk-up apartment building we refer to in our brief as the 936 building. The officers immediately, to go to the first shot spotter, which the defense refers to as a false alarm, there was no, officers responded, there was an investigation, nothing corroborated that, but as one of the officers who testified at the hearing noted in their testimony, nothing refuted it either, that's in the appendix at 122. An hour later, the second shot spotter happens, officers respond immediately. The two primary officers, Officer Bonsack, Officer Lopez, they arrive within two to three minutes. As their car pulls past the 936 building, they observe the defendants make evasive movements upon sighting law enforcement. They observe Hawkins hurrying and they see Diaz pivot. Are those movements the ones on the video? Correct. On the video it looks like he's just trying to walk around the door, doesn't it? Doesn't he just turn to get through the door? That may be, you know, I think there's a couple points there. First is that the officers testified that they observed evasive movements. Judge Kaplan credited their testimony. The defendants, I mean, excuse me, the officers were shown that video on direct and cross-examination. They asked, is that what you saw? And they said, yes. Now the video is at an imperfect angle. It's not ultra HD. And they are making, as is often the case in these reasonable suspicion contacts, very quick decisions based on limited information responding to a report of emergency shots fired. Emergency report of shots fired. They see those movements. Officer Bonsack parks. They exit the car. As Officer Bonsack is approaching, he observes Diaz pressing, with his hands in his pockets, pressing downwards on his sweatshirt, his hoodie pocket, as if to conceal something. He, as they're walking towards him, he asks them, and it was very clear in the record, Judge Kaplan's finding is crystal clear, and Officer Bonsack's testimony is crystal clear. He asks them a request to take their hands out of their pockets, and they voluntarily comply. Well, the testimony is clear. He asked them to take their hands out of their pockets. But the testimony is also clear that they were blocking the exit, right? No, Your Honor. Respectfully, I would say that Judge Kaplan's finding, which is also supported by the testimony and by the video, is that Officer Bonsack makes that request when he's standing outside the gate. He's on the sidewalk. It's later that they block the door. He is standing at the, so. Well, Bonsack says, my first priority was to get to the gate and make sure they cannot leave so I could talk to them and further investigate the shots fired activation, right? Well, Your Honor, I mean, Officer Bonsack's objective, intentions are. They wanted to leave, but they were standing in the way. And that eventually does happen, Your Honor. We are talking about a matter of seconds. So if you look at the video, it shows that Officer Bonsack from at least. And let me just find it. My apologies. I have the timestamp somewhere, Your Honor. I apologize. It is approximately seven seconds as he is walking. Where you can see on the video, he is looking at them, walking towards the entrance. Then he stops standing on the sidewalk and is there for approximately another ten seconds. So you're saying during that period he's on the sidewalk. You're saying the defendants could have just walked out the vestibule and left? He says that when he asks them to move their hands, they're approaching him. They're about five feet away. When they do so, Diaz, and this is Judge Kaplan's opinion at six, where he finds while he's standing outside the vestibule's front gate is when he makes the ask. And this is Bonsack's testimony at the appendix at 39 to 40. He says, I asked them to take their hands out of their pockets as they were approaching me. So they're even still moving as he makes this ask. They do so and he sees the- Well, they could be moving in the vestibule. Correct. Toward the exit. But if he's standing in the exit, it's hard to imagine them getting out. At that point, Your Honor, well, the operative legal question is whether they felt free to leave. And I think Judge Kaplan's reasoning here is important. He says there were two voluntary requests made, one which they obliged and one which they did not. He asked them to take their hands out of their pockets. It rebounds upward and he sees a bulge in his pelvic area. Officer Bonsack then asks for consent to search, which they decline, and attempt to leave. And he prevents them from leaving. At that point, that's when the stop happens. Well, can I just ask just theoretically, let's say that they were blocking the vestibule from the beginning of the interaction and they couldn't exit. Would there have been a reasonable suspicion at that point to effectuate a stop? I guess that's all of the stuff except for the bulge would have been available at that point. Do you need the bulge to have reasonable suspicion? You don't, Your Honor. Again, the stop does not happen until they actually prevent them from leaving. But even if this court found that they were stopped earlier, there was reasonable suspicion. At that point, you have the- I'm sorry to interrupt, but again, if this court finds, it's at this point that I start to wonder whether we're de novo or abuse of discretion. Thank you, Your Honor. It is a point that I wanted to touch on as well, which is the standard of review here. The standard of review is that this court reviews Judge Kaplan's factual findings for clear error. We set forth the standard in our brief at pages 14 to 15. And then the question of whether those facts amounted to reasonable suspicion is a matter of law. This court would assess de novo. So what you're talking about now, you're saying, is a statement of fact? I'm sorry, Your Honor. I'm not sure I understand. I'm sorry. I wonder whether the argument you're making now is an argument that we review de novo or not de novo. The point I was making, Your Honor, is if based on the facts found by Judge Kaplan, if this court interpreted those facts as having amounted to a seizure prior to them preventing them from leaving, there would still be reasonable suspicion there because you have the shot spotter. And another point I want to make sure I hit on the shot spotters is that I believe the defense was mistaken about the hearing testimony about shot spotters. Three officers testified about their lengthy experience and successful experience responding to shot spotters. Two of them said that it's corroborated 75 percent of the time. And another said it was corroborated about half the time. That's well above the standards required for reasonable suspicion. You do not need preponderance of evidence. You don't even need probable cause. We're beneath that. The extensive experience and successful experience responding to shot spotters is incredibly significant here. You have that even if the defendants were stopped earlier. You have the furtive movements when they left the building in a timing consistent with having been rooftop shooters of a six-story walk-up building. You have Diaz pressing his hands downward as if to conceal something in his midsection. That alone, we have more than enough to satisfy the low lenient standard of reasonable suspicion. To be clear, the stop did not happen then. And the necessary condition for a seizure is that a reasonable person would not feel free to leave. The defense doesn't really argue that a reasonable person would not have felt free to leave because the defendants did feel free to leave. That's exactly what they attempted to do. They took their hands out of their pockets in complying with a request. But then they declined a request immediately after that and attempted to leave. They were stopped. At that point, so under the proper analysis, you also have that bulge. And unless the court has further questions. But what about the arrest of Hawkins? Yes, Your Honor. Just because of Diaz's, the gun of Diaz? Yes, Your Honor. And there are multiple pieces connecting Hawkins to the crime. Again, he is, just like Diaz, he's leaving the building. They leave together. I think the defense says that they exit the door at different times. But if you watch the full video, they are walking out together and were together. By the time he's arrested, they've admitted that they were together, although have somewhat conflicting stories about what they were doing inside the building. He's observed leaving the building, timing consistent with being a shooter. He makes furtive movements, hurrying out of the building. They observe a pivot as well. He's walking with Diaz, whom they observe pressing down his midsection as if to conceal something in his pelvic area. But they searched him, but they didn't find anything, right? Searched Hawkins, Your Honor. Hawkins. And the record's clear on that, Your Honor, that they actually search him after he's been arrested. They do a protective frisk. And that's exactly what Judge Kaplan found in his opinion, and the testimony was very clear that he was frisked after his arrest. And nevertheless, I mean, even if a frisk had been done before his arrest, there was strong evidence connecting Hawkins to the crime. To wit, they thought that they committed the shooting on the rooftop together. Why did they think that? Just because they were together? Well, I think there's several things. One, they were together by their own admission. There was a witness who said, I'm a resident of this building. I saw them coming down from the roof, and you should check them. They gave conflicting stories about what they were doing, inconsistent and not credible stories about what they were doing. And then a gun was just found on Cesar Diaz. Very strong evidence connecting that either Hawkins himself had been the shooter or that he had aided and abetted the shooting. In other words, that the two of them were acting in concert to commit the shooting on the roof. Okay. I think we have that argument. Thank you very much, Mr. Ferguson. We'll hear back from Ms. Glashauser on rebuttal. Thank you. The government made mention of evasive movements and furtive movements a bunch of times. That is not something the officers testified about. They did not say either of those phrases. And one of them specifically said exactly the opposite, that she thought the movements were not suspicious. So this is not a record where we have any furtive or evasive movements. And certainly no specificity about what those are. So the record here is clear that without... Do you think the district court was wrong though? Because the district court did think there were evasive movements, right? The district court wrote that there was testimony about evasive or furtive movements. But there wasn't. Yes, obviously I think the district court was wrong. That's why we're here. I think the district court was wrong with respect to that. But that's not a credibility thing that the district court was wrong on. That's just something that there was no testimony about. And that is something that there is de novo review in the reasonable suspicion analysis. With respect to the timing of the stop, I think Your Honor is completely correct that the stop happens immediately. The officers both testify that it's their intention to stop these gentlemen as soon as they walk up. The exit is blocked. I think it's within two seconds. You can see in my brief that... Well, the officers say it's their intention, but as Mr. Ferguson was saying, the officers stop and ask them to remove their hands while in the sidewalk. Is that correct? I don't believe that's correct. First, there's one officer, the same officer who testifies about the bulge. That's the only person that mentions this request to move their hands from their pockets. In fact, their hands are out of their pockets in the video that we see. But putting that to one side, the other video shows that the exit is blocked essentially immediately, within two seconds. And in my brief, I laid out the stills from that video where you can see the vestibule exit blocked immediately. So this is not something that takes any time. The one clear error that the district court does make with respect to those factual findings is the district court says that two officers testified that it was something like 15 seconds before the exit was blocked. That was not the testimony. There was one officer who testified as to that. I understood that the government had been abandoning that argument, which was not in their brief, because the video doesn't support that. The video shows that the stop happens immediately. Even if the court finds differently, the testimony subsequent to that does not support what happens afterwards. Specifically with respect to Mr. Hawkins, he was frisked at the scene. So I was a little confused by the argument that he wasn't. He was frisked before he was taken to the precinct, and it wasn't until the precinct that they found the gun. There was no probable- If he's already under arrest, they're going to take him to the precinct anyway, right? It means that the arrest is based on something else besides the search of him. He was frisked before he was arrested, and there was no reason to arrest him, even if I'm wrong on that factual matter, which I don't believe I am, but I could be. There was no reason to arrest him. There was no probable cause. There was certainly no reason to think that he was a shooter. They found a gun on somebody else. The mere fact that he had walked out of the building and said that he had been inside with that person does not mean that he also committed a crime. The officer's testimony that they generally arrest the group because people commit crimes in groups is just not what the law is. That is not probable cause, and it's not something that the court should uphold. Okay. Thank you, Ms. Glaskauser. Thank you. The case is submitted.